Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMIT PATEL, derivatively on behalf of APPLOVIN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ADAM FOROUGHI, MATTHEW STUMPF, CRAIG BILLINGS, HERALD CHEN, ALYSSA HARVEY DAWSON, MARGARET GEORGIADIS, BARBARA MESSING, TODD MORGENFELD, VICTORIA VALENZUELA, EDUARDO VIVAS, and MAYNARD WEBB,<br><br>Defendants,<br><br>and<br><br>APPLOVIN CORPORATION,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL**<br><br>**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>** |

## INTRODUCTION

Plaintiff Amit Patel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant AppLovin Corporation ("AppLovin" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Adam Foroughi ("Foroughi"), Matthew Stumpf ("Stumpf"), Craig Billings ("Billings"), Herald Chen ("Chen"), Alyssa Harvey Dawson ("Dawson"), Margaret Georgiadis ("Georgiadis"), Barbara Messing ("Messing"), Todd Morgenfeld ("Morgenfeld"), Victoria Valenzuela ("Valenzuela"), Eduardo Vivas ("Vivas"), Maynard Webb ("Webb") (collectively, the "Individual Defendants," and together with AppLovin, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of AppLovin, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Foroughi and Stumpf for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AppLovin, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 11, 2026, through August 5, 2026, inclusive (the "Relevant Period").

2. AppLovin provides a software-based platform for advertisers that strengthens the marketing and monetization of advertising content within the United States and around the world. The Company offers its customers end-to-end artificial intelligence ("AI") powered advertising solutions and are purported to help advertisers to reach, monetize, and grow their audiences. The Company's advertising solutions include AppLovin Ads, MAX, Adjust, and Wurl.

3. In particular, AppLovin Ads (formerly known as Axon Ads Manager) is the Company's self-service platform, through which users can directly create and launch advertisement campaigns. Moreover, the Company's AI models utilized in the platform are purported to streamline the campaign launch process as well as optimize users' ad reach and market targeting. One of the platform's upcoming features is a generative AI video tool which would allow customers to create content specifically designed for the AppLovin Ads platform.

4. During the Relevant Period, the Individual Defendants issued or caused the Company to issue false and misleading statements that made it appear to investors that the Company's AI models used in its advertising solutions were consistently improving and a new generative AI video tool would soon be ready for customer use.

5. For example, on May 6, 2026, the Company held an earnings call for the period ended on March 31, 2026 (the "Q1 2026 Earnings Call"). During the Q1 2026 Earnings Call, Defendant Foroughi touted the growth of the Company's AI models and its positive impact on Company revenue, stating in relevant part:

> ***A couple of weeks ago, we had another material model release that improves scale and return on ad spend significantly for our consumer advertisers. These are the types of compounding improvements we have talked about on prior calls. The team improves the model, advertisers see better returns and they put more budget into our system. It is a virtuous cycle, and it is working.***[1]

[1] All emphasis herein is added unless otherwise stated.

6. The truth began to emerge on July 13, 2026, when an analyst with Bank of America Securities published a report revealing softer e-commerce ad growth than expected for the month of June (the "BofA Analyst Report"). The BofA Analyst Report further concluded, based on publicly available e-commerce data, that the Company's launch of AppLovin Ads for general availability had experienced a "muted . . . start." Based on these findings, Bank of America Securities lowered its annual revenue expectations for the Company.

7. On this news, the price per share of the Company's common stock fell $64.13, or approximately 12.7%, from a closing price of $506.98 on July 10, 2026, to a close at $442.85 per share on July 13, 2026.

8. The truth fully emerged on August 5, 2026, when the Company published a press release and filed a quarterly report on Form 10-Q with the SEC for the period ended on June 30, 2026 (the "Q2 2026 Form 10-Q"). The Q2 2026 Form 10-Q reported lower than anticipated revenue of $1.92 billion compared to estimates of $1.94 billion. During an earnings call held the same day (the "Q2 2026 Earnings Call"), Defendant Foroughi disclosed that the Company's financial performance was attributable to the pace of AI model improvement, which was "lighter than normal during the quarter." Defendant Foroughi further revealed that the generative AI video tool was also "still [a] work in progress."

9. On this news, the price per share of the Company's stock fell $82.13, or approximately 19.7%, from a closing price of $417.80 on August 5, 2026, to a close at $335.67 per share on August 6, 2026.

10. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to AppLovin, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) there were material development

delays with the generative AI video tool intended for use in the Company's advertising platform; (2) as a result, the AI video tool would likely not meet its expected release timeline; (3) the fast pace and consistency of AI model improvements was not sustainable; (4) thus, the reliability and purported benefits, of the Company's AI models to both consumers and the Company were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $110 million.

12. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing AppLovin to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between February 2026 and June 2026, approximately 2.7 million shares of AppLovin common stock were repurchased at artificially inflated prices, costing the Company approximately $1.2 billion. As the Company's stock was actually worth only $335.67 per share, the price it was trading when markets closed on August 6, 2026, the Company overpaid for repurchases of its own stock by approximately $306.5 million in total.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its co-Founder and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to

expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Foroughi's and Defendant Stumpf's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

20. Plaintiff is a current shareholder of AppLovin. Plaintiff has continuously held AppLovin common stock at all relevant times.

**Nominal Defendant AppLovin**

21. AppLovin is a Delaware corporation with corporate headquarters located at 1100 Page Mill Road, Palo Alto, California 94304. AppLovin's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "APP."

**Defendant Foroughi**

22. Defendant Foroughi co-founded the Company in 2011 and has served as its CEO and a director since. He has also served as the Chairperson of the Company's Board from March 2021 to April 2026. According to the Schedule 14A the Company filed with the SEC on April 21, 2026 (the "2026 Proxy Statement"), as of March 31, 2026, Defendant Foroughi owned 2,420,296 shares of AppLovin Class A common stock and 27,936,907 shares of AppLovin Class B stock, representing 61.6% of Company shareholder voting power and thereby making him a controlling shareholder.

23. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Foroughi made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| March 11, 2026 | 640 | $457.96 | $293,094 |
| March 11, 2026 | 2,320 | $458.89 | $1,064,625 |
| March 11, 2026 | 4,371 | $459.95 | $2,010,441 |
| March 11, 2026 | 5,032 | $460.86 | $2,319,048 |
| March 11, 2026 | 8,416 | $461.74 | $2,319,048 |
| March 11, 2026 | 3,079 | $462.81 | $3,886,004 |
| March 11, 2026 | 2,330 | $463.83 | $1,424,992 |
| March 11, 2026 | 2,082 | $464.82 | $1,080,724 |
| March 11, 2026 | 1,755 | $465.86 | $967,755 |
| March 11, 2026 | 2,156 | $466.96 | $817,584 |

| | | | |
|---|---|---|---|
| March 11, 2026 | 2,125 | $467.86 | $1,006,766 |
| March 11, 2026 | 2,120 | $468.79 | $994,203 |
| March 11, 2026 | 1,043 | $469.98 | $993,835 |
| March 11, 2026 | 840 | $471.00 | $490,189 |
| March 11, 2026 | 1,235 | $472.29 | $395,640 |
| March 11, 2026 | 1,830 | $473.27 | $583,278 |
| March 11, 2026 | 2,068 | $474.25 | $866,084 |
| March 11, 2026 | 2,692 | $475.26 | $980,749 |
| March 11, 2026 | 1,480 | $476.25 | $1,279,400 |
| March 11, 2026 | 1,026 | $477.32 | $704,850 |
| March 11, 2026 | 280 | $478.30 | $489,730 |
| March 11, 2026 | 280 | $479.60 | $133,924 |
| March 11, 2026 | 680 | $480.60 | $134,288 |
| March 11, 2026 | 120 | $481.57 | $326,808 |
| March 12, 2026 | 2,430 | $449.38 | $57,788 |
| March 12, 2026 | 2,346 | $449.98 | $1,091,993 |
| March 12, 2026 | 400 | $450.97 | $1,055,653 |
| March 12, 2026 | 1,680 | $452.41 | $180,388 |
| March 12, 2026 | 2,440 | $453.27 | $760,049 |
| March 12, 2026 | 3,061 | $454.29 | $1,390,582 |
| March 12, 2026 | 3,720 | $455.18 | $1,693,270 |
| March 12, 2026 | 2,881 | $456.28 | $1,314,543 |
| March 12, 2026 | 2,520 | $457.36 | $1,152,547 |
| March 12, 2026 | 3,610 | $458.35 | $1,654,644 |
| March 12, 2026 | 4,480 | $459.37 | $2,057,978 |
| March 12, 2026 | 3,680 | $460.31 | $1,693,941 |
| March 12, 2026 | 4,120 | $461.30 | $1,900,556 |
| March 12, 2026 | 3,701 | $462.37 | $1,711,231 |
| March 12, 2026 | 3,204 | $463.33 | $1,484,509 |
| March 12, 2026 | 2,602 | $464.38 | $1,208,317 |
| March 12, 2026 | 2,207 | $465.40 | $1,027,138 |
| March 12, 2026 | 640 | $466.22 | $298,381 |
| March 12, 2026 | 240 | $467.41 | $112,178 |
| March 12, 2026 | 38 | $468.33 | $17,797 |
| June 10, 2026 | 948 | $493.11 | $467,468 |
| June 10, 2026 | 360 | $494.84 | $178,142 |
| June 10, 2026 | 920 | $496.22 | $456,522 |
| June 10, 2026 | 1,080 | $497.19 | $536,965 |
| June 10, 2026 | 1,220 | $498.27 | $607,889 |

| | | | |
|---|---|---|---|
| June 10, 2026 | 1,200 | $499.28 | $599,136 |
| June 10, 2026 | 2,159 | $500.24 | $1,080,018 |
| June 10, 2026 | 1,530 | $501.22 | $766,867 |
| June 10, 2026 | 1,080 | $502.35 | $542,538 |
| June 10, 2026 | 413 | $503.33 | $207,875 |
| June 10, 2026 | 642 | $504.39 | $323,818 |
| June 10, 2026 | 920 | $505.40 | $464,968 |
| June 10, 2026 | 1,080 | $506.46 | $546,977 |
| June 10, 2026 | 1,569 | $507.63 | $796,471 |
| June 10, 2026 | 1,072 | $508.63 | $545,251 |
| June 10, 2026 | 520 | $509.44 | $264,909 |
| June 10, 2026 | 880 | $510.70 | $449,416 |
| June 10, 2026 | 1,080 | $511.56 | $552,485 |
| June 10, 2026 | 600 | $512.69 | $307,614 |
| June 10, 2026 | 720 | $513.51 | $369,727 |
| June 10, 2026 | 440 | $514.71 | $226,472 |
| June 10, 2026 | 320 | $515.88 | $165,082 |
| June 10, 2026 | 80 | $516.51 | $41,321 |
| June 11, 2026 | 920 | $473.55 | $435,666 |
| June 11, 2026 | 1,433 | $474.45 | $679,887 |
| June 11, 2026 | 1,647 | $475.51 | $783,165 |
| June 11, 2026 | 1,280 | $476.53 | $609,958 |
| June 11, 2026 | 1,330 | $477.56 | $635,155 |
| June 11, 2026 | 2,014 | $478.52 | $963,739 |
| June 11, 2026 | 1,280 | $479.47 | $613,722 |
| June 11, 2026 | 840 | $480.56 | $403,670 |
| June 11, 2026 | 1,613 | $481.83 | $777,192 |
| June 11, 2026 | 2,387 | $482.71 | $1,152,229 |
| June 11, 2026 | 2,636 | $483.73 | $1,275,112 |
| June 11, 2026 | 2,874 | $484.72 | $1,393,085 |
| June 11, 2026 | 2,250 | $485.55 | $1,092,488 |
| June 11, 2026 | 2,600 | $486.77 | $1,265,602 |
| June 11, 2026 | 1,117 | $487.71 | $544,772 |
| June 11, 2026 | 4,250 | $488.88 | $2,077,740 |
| June 11, 2026 | 4,977 | $489.80 | $2,437,735 |
| June 11, 2026 | 2,948 | $490.71 | $1,446,613 |
| June 11, 2026 | 1,950 | $491.78 | $958,971 |
| June 11, 2026 | 800 | $492.63 | $394,104 |
| June 11, 2026 | 520 | $493.96 | $256,859 |

| | | | |
|---|---|---|---|
| June 11, 2026 | 840 | $473.92 | $398,093 |
| June 11, 2026 | 840 | $475.39 | $399,328 |
| June 11, 2026 | 2,324 | $476.36 | $1,107,061 |
| June 11, 2026 | 1,610 | $477.34 | $768,517 |
| June 11, 2026 | 860 | $478.32 | $411,355 |
| June 11, 2026 | 360 | $479.52 | $172,627 |
| June 11, 2026 | 284 | $480.51 | $136,465 |
| June 11, 2026 | 812 | $481.71 | $391,149 |
| June 11, 2026 | 1,284 | $482.47 | $619,491 |
| June 11, 2026 | 1,080 | $483.69 | $522,385 |
| June 11, 2026 | 2,160 | $484.73 | $1,047,017 |
| June 11, 2026 | 3,421 | $485.66 | $1,661,443 |
| June 11, 2026 | 1,699 | $486.82 | $827,107 |
| June 11, 2026 | 1,280 | $487.62 | $624,154 |
| June 12, 2026 | 269 | $488.65 | $131,447 |
| June 12, 2026 | 600 | $489.94 | $293,964 |
| June 12, 2026 | 1,160 | $490.92 | $569,467 |
| June 12, 2026 | 2,003 | $491.94 | $985,356 |
| June 12, 2026 | 1,755 | $493.14 | $865,461 |
| June 12, 2026 | 2,820 | $494.01 | $1,393,108 |
| June 12, 2026 | 4,884 | $495.01 | $2,417,629 |
| June 12, 2026 | 2,471 | $496.09 | $1,225,838 |
| June 12, 2026 | 4,257 | $496.91 | $2,115,346 |
| June 12, 2026 | 1,674 | $498.03 | $833,702 |
| June 12, 2026 | 920 | $498.91 | $458,997 |

Thus, in total, before the fraud was exposed, Defendant Foroughi sold 204,166 shares of Company stock on inside information, for which he received approximately $98.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

24. The 2026 Proxy Statement stated the following about Defendant Foroughi:

**Mr. Foroughi is one of our co-founders and has served as our Chief Executive Officer and a member of our Board of Directors since December 2011.**

> He served as Chairperson of our Board of Directors from March 2021 until April 2026. He previously co-founded two advertising technology companies, Lifestreet Media Inc. and Social Hour Inc. Mr. Foroughi holds a B.A. in Business Administration from the University of California, Berkeley.
>
> **Qualifications**
>
> Mr. Foroughi was selected to serve on our Board of Directors because of his deep industry knowledge and the vision and experience he brings as our Chief Executive Officer and Co-Founder. With expertise in international operations, product development, building high-performing teams, and driving strategic vision, he has successfully led us through growth and innovation in the ever-evolving tech landscape.

(Emphasis in original).

**<u>Defendant Stumpf</u>**

25. Defendant Stumpf has served as the Company's CFO since January 2024. He previously served various roles at the Company starting in February 2020, including serving as the Company's Vice President of Finance and FP&A from July 2022 until December 2023.

26. The 2026 Proxy Statement stated the following about Defendant Stumpf:

> Mr. Stumpf has served as our Chief Financial Officer since January 2024 and prior to that served as our Vice President of Finance and FP&A from July 2022 through December 2023 and as our Senior Director, FP&A from February 2020 through June 2022. Prior to joining us, Mr. Stumpf worked at PricewaterhouseCoopers, an audit and assurance, consulting and tax services firm, from 2006 to 2020 in roles of increasing responsibility, including most recently as Transaction Services - Financial Due Diligence Director. He holds a B.A. in Business Management Economics from the University of California, Santa Cruz.

**<u>Defendant Billings</u>**

27. Defendant Billings has served as a Company director since December 2020, and as the Chairperson of the Board since April 2026. He previously served as the Lead

Independent Director from February 2021 to April 2026. Defendant Billings also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

28. The 2026 Proxy Statement stated the following about Defendant Billings:

> **Mr. Billings has served as a member of our Board of Directors since December 2020 and as our Chairperson since April 2026.**
>
> Mr. Billings previously served as our Lead Independent Director from February 2021 until his appointment as our independent Chairperson. Mr. Billings has served as Chief Executive Officer and a member of the board of directors of Wynn Resorts, Limited (NYSE: WYNN), a developer and operator of hotels and casinos, since February 2022. Prior to February 2022, Mr. Billings served as the Chief Financial Officer and Treasurer of Wynn Resorts from March 2017 to January 2022 and as President from May 2019 to May 2021. Since August 2018, he has also served as a Director of Wynn Macau, Limited, a majority owned subsidiary of Wynn Resorts that is listed on the Hong Kong Stock Exchange. From December 2015 to January 2018, Mr. Billings served as Non-Executive Chairman of NYX Gaming Group Ltd., a developer of digital gaming systems which was acquired by Scientific Games Corporation in January 2018. Mr. Billings has been a Certified Public Accountant since 1999. He holds a B.S. in Business Administration from the University of Nevada, Las Vegas and an M.B.A. from Columbia Business School.
>
> **Qualifications**
>
> Mr. Billings was selected to serve on our Board of Directors because of his significant global operational experience as a public-company CEO, his financial and accounting acumen, his risk management and corporate governance expertise, and his industry knowledge—qualities that bring a strategic perspective to the boardroom and position him to guide us through complex challenges and growth opportunities.

(Emphasis in original).

**<u>Defendant Chen</u>**

29. Defendant Chen has served as a Company director since August 2018. Previously, Defendant Chen also served as the Company's President and CFO from November 2019 until December 2023.

30. The 2026 Proxy Statement stated the following about Defendant Chen:

> **Mr. Chen has served as a member of our Board of Directors since August 2018.**
>
> Mr. Chen previously served as AppLovin's President and Chief Financial Officer from November 2019 to December 2023. Prior to joining us, he served as the head of Technology, Media and Telecom at Kohlberg Kravis Roberts & Co. L.P. (NYSE: KKR), an investment firm that manages multiple alternative asset classes, from 2007 to 2019, having previously worked for the firm from 1995 to 1997. He also currently serves on the board of directors of GoDaddy, Inc. (NYSE: GDDY), an online solutions provider, and Internet Brands Inc., an integrated digital media and software services company. Mr. Chen holds a B.S. in Economics (Finance) and a B.S.E. in Mechanical Engineering from the University of Pennsylvania and an M.B.A. from the Stanford University Graduate School of Business.
>
> **Qualifications**
>
> Mr. Chen was selected to serve on our Board of Directors because of his extensive operating and management experience. He brings strong financial and accounting expertise, along with significant experience in public company leadership, strategic transactions, and governance. His experience serving on the boards of both public and private technology companies provides valuable oversight and strategic insight to our Board.

(Emphasis in original).

**<u>Defendant Dawson</u>**

31. Defendant Dawson served as a Company director from November 2021 until June 2026.

32. The Schedule 14A the Company filed with the SEC on April 22, 2025, stated the following about Defendant Dawson:

> **Ms. Harvey Dawson has served as a member of our Board of Directors since November 2021.**
>
> Ms. Harvey Dawson served as Chief Legal Officer and Corporate Secretary for HubSpot, Inc. (NYSE: HUBS), a leading CRM platform, from November 2022 to December 2024, where she was responsible for overseeing the company's legal and compliance teams, and as an Advisor to HubSpot from December 2024 to March 2025. Prior to joining HubSpot, she served as the Chief Legal Officer of Gusto, Inc., a modern HR platform, from August 2020 to November 2022, and on the executive leadership team, overseeing the company's legal, compliance and government affairs team. Previously, from June 2017 to July 2020, she was General Counsel at Sidewalk Labs, an urban innovation subsidiary of Alphabet Inc., where, among other things, she was responsible for developing the legal team and data privacy strategy. From 2011 to 2017 she oversaw global IP and licensing at HARMAN, a Samsung company, as its Vice President, Global Intellectual Property, and was Associate General Counsel at Netflix (NASDAQ: NFLX) from 2008 to 2011. Prior to Netflix, she was also at Autodesk (NASDAQ: ADSK). Ms. Harvey Dawson received her BA, cum laude, in Journalism from Michigan State University and was an Honors College member. She received her JD, cum laude, from Georgetown University Law Center. Ms. Harvey Dawson is also a board member of Make-A-Wish Connecticut and is a member of the Georgetown University Law School Board of Visitors.
>
> **Qualifications**
>
> Ms. Harvey Dawson was selected to serve on our Board of Directors because she has over 25 years of broad-based legal experience and has overseen corporate governance, mergers and acquisitions, commercial transactions, enterprise risk management, compliance, data privacy, intellectual property, regulatory, and governmental/public affairs matters.

(Emphasis in original).

**<u>Defendant Georgiadis</u>**

33. Defendant Georgiadis has served as a Company director since January 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

34. The 2026 Proxy Statement stated the following about Defendant Georgiadis:

**Ms. Georgiadis has served as a member of our Board of Directors since January 2021.**

Ms. Georgiadis currently serves as Co-Founder and Chief Executive Officer of Montai Therapeutics and as a CEO-Partner of Flagship Pioneering Inc., a bioplatform innovation company, since April 2022. She previously served as an Endurance Partner-in-Residence at General Catalyst, a venture capital firm, from January 2021 to April 2022. From May 2018 to December 2020, she served as President and Chief Executive Officer of Ancestry.com LLC, a global family history and consumer genomics company. Prior to Ancestry, from February 2017 to May 2018, Ms. Georgiadis served as Chief Executive Officer of Mattel, Inc. (NASDAQ: MAT), a global children's entertainment company specializing in toys and consumer products. From 2009 to 2017, she served as President of Google Americas and the Vice President of Global Operations. She is an experienced public and private company board director and currently serves on the board of directors of McDonald's Corporation (NYSE: MCD) and several private companies in technology and health technology. She holds an A.B. from Harvard College and an M.B.A. from Harvard Business School.

**Qualifications**

Ms. Georgiadis was selected to serve on our Board of Directors because of her experience as a public company director and deep expertise in the tech industry. With extensive CEO and public company experience, she brings a strategic and operational mindset to the boardroom. Her background spans product development, ad tech, and data privacy, complemented by strong financial, accounting and risk management acumen. A leader in corporate governance with a strong track record in international operations, strategic transactions, and talent development, she provides critical oversight while driving innovation and growth.

(Emphasis in original).

**<u>Defendant Messing</u>**

35. Defendant Messing has served as a Company director since March 2024. She also serves as a member of Compensation Committee and the Nominating and Corporate Governance Committee.

36. The 2026 Proxy Statement stated the following about Defendant Messing:

> **Ms. Messing has served as a member of our Board of Directors since March 2024.**
>
> Ms. Messing has served as an Operating Partner at Stripes, LLC ("Stripes Group"), a leading growth equity firm since January 2026. Prior to joining Stripes Group, Ms. Messing served as Chief Marketing & Communications Officer at Roblox Corp. (NYSE: RBLX), an online gaming platform, from August 2020 to December 2023 and previously served as Chief Marketing Officer and People Experience Officer from August 2020 to July 2023. Previously, Ms. Messing served as Senior Vice President, Chief Marketing Officer of Walmart U.S (NYSE: WMT) from August 2018 to August 2019, and brought her years of experience serving in multiple roles including Vice President and Chief Marketing Officer, and later Senior Vice President and Chief Marketing Officer at TripAdvisor, Inc. (NASDAQ: TRIP) an online travel company, between 2011 and 2018. Between 2002 and 2011, she served in a number of management positions at Hotwire.com, an internet-based travel agency, including Vice President of Customer Experience and Vice President and General Manager, Travel Ticker. Ms. Messing previously served on the board of directors of Vacasa, Inc., a leading platform for vacation rental management, from 2021 to 2025, Overstock.com, Inc., an internet retailer, from 2020 to 2023, and XO Group, Inc., which merged with WeddingWire in December 2018, from 2014 to 2018. Ms. Messing received her B.A. from Northwestern University and her J.D. from Stanford Law School.
>
> **Qualifications**
>
> Ms. Messing was selected to serve on our Board of Directors because of her extensive operational expertise and leadership experience in both management and director roles at public companies. She brings deep knowledge in marketing, digital media, product development, and ad tech, along with a strong background in building and scaling online platforms. Her experience in human capital and talent development further enhances our ability to drive organizational growth and foster leadership excellence.

(Emphasis in original).

**<u>Defendant Morgenfeld</u>**

37. Defendant Morgenfeld has served as a Company director since September 2023. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

38. The 2026 Proxy Statement stated the following about Defendant Morgenfeld:

> **Mr. Morgenfeld has served as a member of our Board of Directors since September 2023.**
>
> Mr. Morgenfeld previously held pivotal roles at Pinterest, Inc. (NYSE: PINS), a discovery and social media platform, including Chief Financial Officer and Head of Business Operations (CFO/COO) from November 2016 to July 2023. Before Pinterest, he left his mark at Twitter as Vice President of Finance from 2015 to 2016 and at Hewlett-Packard (NYSE: HPQ) as Treasurer and Senior VP of Financial Analytics and Corporate Development from 2013 to 2015. Prior to his role at Hewlett-Packard, he was an investment partner at Silver Lake from 2004 to 2013. Mr. Morgenfeld currently serves on the board of directors of Urban Outfitters, Inc. (NASDAQ: URBN), a portfolio of global consumer brands comprising Urban Outfitters, Anthropologie, Free People, BHLDN, Terrain, Menus & Venues, and Nuuly; and Axon Enterprise, Inc. (NASDAQ: AXON), a technology leader in global public safety. Mr. Morgenfeld graduated first in his class from the United States Military Academy at West Point and holds an M.B.A. from Stanford University Graduate School of Business.
>
> **Qualifications**
>
> Mr. Morgenfeld was selected to serve on our Board of Directors because of his deep operational expertise in technology-driven enterprises. He has a strong background in finance and accounting, and his public company board experience helps him bring valuable insights into public company financial oversight, risk management, and corporate governance matters.

(Emphasis in original).

**Defendant Valenzuela**

39. Defendant Valenzuela has served as a Company director since June 2026. Previously, Defendant Valenzuela served as the Company's Chief Administrative and Legal Officer and Corporate Secretary from July 2025 to August 2026.

40. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Valenzuela made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| June 4, 2026 | 720 | $555.63 | $400,054 |
| June 4, 2026 | 560 | $556.52 | $311,651 |
| June 4, 2026 | 1,280 | $557.64 | $713,779 |
| June 4, 2026 | 1,202 | $558.71 | $671,569 |
| June 4, 2026 | 2,870 | $559.69 | $1,606,310 |
| June 4, 2026 | 924 | $560.67 | $518,059 |
| June 4, 2026 | 1,760 | $561.71 | $988,610 |
| June 4, 2026 | 1,548 | $562.77 | $871,168 |
| June 4, 2026 | 1,012 | $563.76 | $570,525 |
| June 4, 2026 | 560 | $564.90 | $316,344 |
| June 4, 2026 | 440 | $566.01 | $249,044 |
| June 4, 2026 | 678 | $567.04 | $384,453 |
| June 4, 2026 | 366 | $568.34 | $208,012 |
| June 4, 2026 | 160 | $569.10 | $91,056 |
| June 4, 2026 | 240 | $570.30 | $136,872 |
| June 4, 2026 | 560 | $571.22 | $319,883 |
| June 4, 2026 | 480 | $572.39 | $274,747 |
| June 4, 2026 | 320 | $573.33 | $183,466 |
| June 4, 2026 | 660 | $574.60 | $379,236 |
| June 4, 2026 | 780 | $575.57 | $448,945 |
| June 4, 2026 | 480 | $576.49 | $276,715 |
| June 4, 2026 | 480 | $577.66 | $277,277 |
| June 4, 2026 | 360 | $579.61 | $208,660 |
| June 4, 2026 | 200 | $581.00 | $116,200 |
| June 4, 2026 | 80 | $581.81 | $46,545 |
| June 4, 2026 | 320 | $583.69 | $186,781 |
| June 4, 2026 | 419 | $584.53 | $244,918 |
| June 4, 2026 | 335 | $585.55 | $196,159 |
| June 4, 2026 | 206 | $586.49 | $120,817 |

Thus, in total, before the fraud was exposed, Defendant Valenzuela sold 20,000 shares of Company stock on inside information, for which she received approximately $11.3 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

41. The 2026 Proxy Statement stated the following about Defendant Valenzuela:

> **Ms. Valenzuela is standing for election as a member of our Board of Director for the first time.**
>
> Ms. Valenzuela has served as our Chief Administrative & Legal Officer and Corporate Secretary since July 2025. She previously served as our Chief Legal Officer and Corporate Secretary from May 2020 through July 2025. Ms. Valenzuela joined us through our acquisition of Machine Zone, Inc. where she served as Chief Legal Officer and Corporate Secretary from January 2015 to April 2020. From May 2004 to December 2014, she served as General Counsel, Vice President, Legal Affairs, and Corporate Secretary of Cypress Semiconductor Corporation, a public semiconductor company acquired by Infineon Technologies AG. Prior to Cypress Semiconductor, she was a corporate and technology attorney with Brobeck, Phleger & Harrison, LLP and Clifford Chance LLP. She holds a B.A. in Political Science from California State University, Fullerton and a J.D. from Stanford University Law School.
>
> **Qualifications**
>
> Ms. Valenzuela was selected to serve on our Board of Directors because of her deep Company and industry knowledge as an executive at AppLovin and other technology companies. She has expertise in legal and regulatory matters, in particular with respect to ad tech, cybersecurity and data privacy matters. Ms. Valenzuela also has extensive experience in mergers, acquisitions and strategic transactions, as well as strong experience in human capital and talent development.

(Emphasis in original).

**<u>Defendant Vivas</u>**

42. Defendant Vivas has served as a Company director since August 2018. He also serves as a member of the Nominating and Corporate Governance Committee.

43. The 2026 Proxy Statement stated the following about Defendant Vivas:

> **Mr. Vivas has served as a member of our Board of Directors since August 2018.**

> Mr. Vivas served as Chief Operating Officer at Humans, Inc., the developer of the Flip Shop social shopping app, from March 2024 to September 2025. From August 2017 to March 2024, he served as the Chief Executive Officer at Curated, Inc. (Curated.com), an online outdoor sports retailer he co-founded. From March 2014 to April 2017, Mr. Vivas served as Head of Product, Talent Solutions at LinkedIn Corporation, a business and employment-oriented online service. He joined LinkedIn through its acquisition of Bright.com, an employment website company he co-founded and served as Chief Product Officer of from October 2011 to February 2014.
>
> **Qualifications**
>
> Mr. Vivas was selected to serve on our Board of Directors because of his experience as a CEO and executive leader in the technology sector. His expertise in marketing, digital media, product development, and ad tech has been instrumental in shaping and executing successful go-to-market strategies. Mr. Vivas also has extensive experience in mergers, acquisitions, and strategic transactions, providing valuable insight into business expansion and corporate development.

(Emphasis in original).

**<u>Defendant Webb</u>**

44. Defendant Webb has served as a Company director since April 2025. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

45. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Webb made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| June 5, 2026 | 400 | $577.83 | $231,132 |
| June 5, 2026 | 1,160 | $578.63 | $671,211 |
| June 5, 2026 | 240 | $580.25 | $139,260 |
| June 5, 2026 | 210 | $581.58 | $122,132 |
| June 5, 2026 | 560 | $584.52 | $327,331 |

| | | | |
|---|---|---|---|
| June 5, 2026 | 22 | $587.30 | $12,921 |
| June 5, 2026 | 320 | $591.02 | $189,126 |
| June 5, 2026 | 164 | $593.00 | $97,252 |
| July 6, 2026 | 380 | $516.25 | $196,175 |
| July 6, 2026 | 202 | $517.19 | $104,472 |
| July 6, 2026 | 182 | $518.63 | $94,391 |
| July 6, 2026 | 240 | $519.56 | $124,694 |
| July 6, 2026 | 138 | $520.60 | $71,843 |
| July 6, 2026 | 120 | $521.49 | $62,579 |
| July 6, 2026 | 412 | $522.42 | $215,237 |
| July 6, 2026 | 1,140 | $523.49 | $596,779 |
| July 6, 2026 | 262 | $524.12 | $137,319 |

Thus, in total, before the fraud was exposed, Defendant Webb sold 6,152 shares of Company stock on inside information, for which he received approximately $3.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46. The 2026 Proxy Statement stated the following about Defendant Webb:

> **Mr. Webb has served as a member of our Board of Directors since April 2025.**
>
> Mr. Webb is the Founder of Webb Investment Network, an early-stage venture capital firm he started in 2010. Mr. Webb served as the Chairman of the board of Liveops, Inc., a cloud-based call center, from 2008 to 2013 and was the Chief Executive Officer from 2006 to 2011. Previously, Mr. Webb was the Chief Operating Officer of eBay, Inc. (NASDAQ: EBAY), a global commerce and payments provider, from 2002 to 2006, and President of eBay Technologies from 1999 to 2002. Prior to joining eBay, Mr. Webb was Senior Vice President and Chief Information Officer at Gateway, Inc., a computer manufacturer, and Vice President and Chief Information Officer at Bay Networks, Inc., a computer networking products manufacturer. Mr. Webb currently serves on the board of directors of Salesforce, Inc. (NYSE: CRM) and Visa Inc. (NYSE: V). Mr. Webb previously served as the Chairman of the board of directors at Yahoo! Inc. until 2017. Mr. Webb holds a Bachelor of Applied Arts degree from Florida Atlantic University.
>
> **Qualifications**

> Mr. Webb was selected to serve on our Board of Directors because of his extensive leadership experience as a CEO, executive advisor, and investment professional. He brings deep operational expertise in marketing, digital media, product development, and ad tech, along with a strong track record of scaling businesses. He also brings strong experience in strategic transactions and international operations. Additionally, his governance experience on the boards of public and private technology companies provides valuable oversight and strategic insight to our Board.

(Emphasis in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47. By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of AppLovin and because of their ability to control the business and corporate affairs of AppLovin, the Individual Defendants owed AppLovin and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AppLovin in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AppLovin and its shareholders so as to benefit all shareholders equally.

48. Each controlling shareholder, director, and officer of the Company owes to AppLovin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49. The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of AppLovin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50. To discharge their duties, the controlling shareholder, officers, and directors of AppLovin were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51. Each Individual Defendant, by virtue of their position as a controlling

shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of AppLovin, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

52. As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53. To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such

duties, the controlling shareholder, officers, and directors of AppLovin were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to AppLovin's corporate governance guidelines and its Code of Conduct and Business Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how AppLovin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of AppLovin and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AppLovin's operations would comply with all applicable laws and AppLovin's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54. Each of the Individual Defendants further owed to AppLovin and the shareholders the duty of loyalty requiring that each favor AppLovin's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55. At all times relevant hereto, the Individual Defendants were the agents of each other and of AppLovin and were at all times acting within the course and scope of such agency.

56. Because of their advisory, executive, managerial, directorial, and controlling positions with AppLovin, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

57. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AppLovin.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59. The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

60. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AppLovin was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AppLovin and was at all times acting within the course and scope of such agency.

## APPLOVIN'S CODE OF CONDUCT

63. AppLovin's Code of Conduct represents that it "was adopted to further AppLovin's commitment to conducting its business with honesty and integrity." The Code of Conduct goes on to state that it "applies to all directors, officers and employees of the Company (who, unless otherwise specified, are collectively 'employees'), as well as contractors and consultants of the Company."

64. In the section "Financial Reports and Other Records – Disclosure," the Code of Conduct states:

> Employees, contractors and consultants are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to the Company. The Company expects all of its employees, contractors and consultants to take this responsibility very seriously to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.
>
> Each employee, contractor and consultant, to the extent involved in the Company's disclosure process, including without limitation, the principal executive officer, principal financial officer and other senior employees who perform similar functions in the Company (collectively, "**Senior Financial Officers**"), must familiarize themselves with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.
>
> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, all books, records, accounts and financial statements must conform both to applicable legal requirements and to the Company's system of internal controls. All assets of the Company must be carefully and properly accounted for. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation and authorization.

> Misclassification of transactions as to accounts, business units or accounting periods is forbidden. Each employee, contractor and consultant bears responsibility for ensuring that they are not party to a false or misleading accounting entry.

(Emphasis in original).

65. In the section "Conflicts of Interest," the Code of Conduct states, in relevant part:

> A conflict of interest is any activity or interest that is inconsistent with or opposed to the best interests of the Company. Your decision and actions in the course of employment or other relationship with the Company should be based on the best interests of the Company and not based on personal relationships or benefits. You must never use or attempt to use your position with the Company to obtain improper personal benefits. Any situation, transaction or relationship that may give rise to an actual or potential conflict of interest must be disclosed to the Company and shall be avoided, unless approved by the Company.

66. In the section "Protection of Assets, Confidentiality & Communications," the Code of Conduct states:

> You should endeavor to protect the Company's assets and ensure their efficient use. Any suspected incident of fraud or theft should be reported immediately to your immediate supervisor or manager or other appropriate Company personnel for investigation.
>
> In carrying out the Company's business, you may learn confidential or proprietary information about the Company, its customers, suppliers or business partners. Confidential or proprietary information of the Company, and of other companies, includes any non-public information that would be harmful to the relevant company or useful to competitors if disclosed.
>
> You must maintain the confidentiality of information about the Company and other companies entrusted to you by the Company, use the information only for permissible business purposes and in accordance with any restrictions imposed by the disclosing party, and limit dissemination of the confidential information, both inside and outside the Company, to people who need to know the information for business purposes and who are bound by similar obligations of confidentiality, unless disclosure is authorized or legally

mandated.

67. In the section "Compliance with Laws, Rules & Regulations," the Code of Conduct states, in relevant part:

> You must respect and obey all laws when carrying out responsibilities on behalf of the company and refrain from illegal conduct.
>
> You have an obligation to be knowledgeable about specific laws, rules and regulations that apply to your area of responsibility. If a law conflicts with a policy in this Code, you must comply with the law.
>
> * * *
>
> 6. Insider Trading
>
> Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because you will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material non-public information, trading in the Company's securities or in the securities of those companies with which we do business could constitute insider trading and could violate the law, as could giving material non-public information to others who trade on that information. It is your responsibility to comply with these laws and not to share material non-public information. We have also adopted an Insider Trading Policy with which you must comply. For more information about insider trading laws, please reference our Insider Trading Policy, which can be found on the Company's internal website.

68. In the section "Compliance and Reporting," in which the Code of Conduct states, in relevant part:

> 2. Reporting Violations
>
> If you know of or suspect a violation of this Code, or of applicable laws and regulations (including complaints or concerns about accounting, internal accounting controls or auditing matters), you must report it immediately to AppLovin's Legal Team. See the Whistleblower Policy for information about making anonymous reports.

> All reports will be kept confidential, to the extent practical, except where disclosure is required to investigate a report or mandated by law. The Company does not permit retaliation of any kind for good faith reports of violations or possible violations.
>
> * * *
>
> 5. Sanctions
>
> Violations of this Code may result in disciplinary action, up to and including termination. Moreover, employees or officers who direct or approve of any conduct in violation of this Code, or who have knowledge of such conduct but do not immediately report it may also be subject to disciplinary action, up to and including termination of employment. A director who violates this Code or directs or approves conduct in violation of this Code shall be subject to action as determined by the Board.
>
> Furthermore, violations of some provisions of this Code are illegal and may subject you to civil and criminal liability.

69. In the section "Waivers of this Code," the Code of Conduct states:

> Any amendment or waiver of any provision of this Code must be approved in writing by AppLovin's Chief Legal Officer or Chief Financial Officer, and promptly disclosed pursuant to applicable laws and regulations. Any waiver or modification of this Code for a director or Senior Financial Officer will be approved by the Board and promptly disclosed to stockholders if and as required by applicable law or the rules of the applicable stock exchange.

70. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $110 million. Also, in

violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## APPLOVIN'S AUDIT COMMITTEE CHARTER

71. AppLovin also maintains an Audit Committee Charter (the "Audit Committee Charter"), which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter described the purpose of the Audit Committee as:

> The purpose of the Committee is to assist the Board in fulfilling its responsibilities for overseeing:
>
> - The Company's accounting and financial reporting processes and internal controls, as well as the audit and integrity of the Company's financial statements.
> - The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").
> - The design, implementation and performance of the Company's internal audit function.
> - The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
> - The Company's policies with respect to risk assessment and risk management pertaining to the: financial, accounting and tax; technology, including artificial intelligence (AI), and information security, including cybersecurity; and data privacy and protection matters of the Company.

72. Under the heading titled "Responsibilities," in a subsection titled "Review Financial Statements," the Audit Committee Charter states, in relevant part:

> The Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

73. Under the same heading, in a subsection titled "Earnings Press Releases and Earnings Guidance," the Audit Committee Charter states the following:

> The Committee will review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

74. Under the same heading, in a subsection titled "Internal Controls," the Audit Committee Charter states the following:

> The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

75. Under the same heading, in a subsection titled "Disclosure Controls and Procedures," the Audit Committee Charter states the following:

> The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

76. Under the same heading, in a subsection titled "Risk Assessment and Risk Management," the Audit Committee Charter states the following:

> The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to: financial, accounting and tax; technology, including AI, and information security, including cybersecurity; and data privacy and protection matters. The Committee will also review the Company's risk management framework and programs to address risks, including a review of the Company's network security program and controls with the Company's Head of Information Security and Compliance and evaluate the adequacy of the Company's data privacy compliance program with the Chief Legal Officer or Head of Privacy, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

77. Under the same heading, in a subsection titled "Legal and Regulatory Compliance," the Audit Committee Charter states the following:

The Committee shall:

- Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with a senior member of the Company's Legal Team any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

78. Under the same heading, in a subsection titled "Conflicts of Interest," the Audit Committee Charter states:

The Committee shall:

● Review and monitor compliance with the Company's Code of Business Conduct and Ethics.

● Consider questions of actual or possible conflicts of interest of Board members and of corporate officers and approve or prohibit applicable transactions or matters.

79. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement,

abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80. AppLovin provides a software-based platform for advertisers that strengthens the marketing and monetization of advertising content within the United States and around the world. The Company offers its customers end-to-end artificial intelligence ("AI") powered advertising solutions and are purported to help advertisers to reach, monetize, and grow their audiences. The Company's advertising solutions include AppLovin Ads, MAX, Adjust, and Wurl.

81. AppLovin Ads, the Company's self-service advertising platform, is intended to optimize, automate, and manage customer acquisition. As part of the AppLovin Ads platform, the Company is developing a generative AI video tool that is intended to assist users with creating video content specifically designed for the platform.

82. Revenue for AppLovin Ads is comprised of fees collected from advertisers utilizing the platform. Notably, AppLovin Adds represents the Company's primary revenue generator. For example, the Q2 2026 Form 10-Q noted that revenue for the second quarter of 2026 increased by 53% compared to the same period in the previous year, primarily due to improved AppLovin Ads performance.

## FALSE AND MISLEADING STATEMENTS

### *February 11, 2026 Earnings Call*

83. The Relevant Period began on February 11, 2026, when the Company held an earnings call to discuss its fourth quarter and full-year 2025 financial results (the "FY 2025 Earnings Call"). During the FY 2025 Earnings Call, Defendant Foroughi assured investors

of the financial viability of the Company's AI models, despite recent instability in the Company's share price. Specifically, Defendant Foroughi stated, in relevant part:

> Thanks, everyone, for joining us today. I want to start by addressing what's clearly on many people's minds. While I prefer to ignore short-term fluctuations in the stock price and focus on maximizing value over the long term, the recent volatility warrants addressing. For the past few weeks, there's been a lot of discussion about how AI and competition will challenge our business. ***But when I look at our internal dashboards, we are delivering the strongest operating performance in our history. What's fueling that growth is our own AI models. And as research and AI, both internal and external, continues to improve, our business will grow with it***. There is a real disconnect between market sentiment and the reality of our business.

84. Defendant Foroughi further asserted that AppLovin Ads could positively impact the Company's financial performance in the upcoming financial quarter, providing in relevant part:

> Now that brings me to what we control, performance and culture. Our performance. Our business is executing extremely well. We continue to grow very quickly despite the numbers getting much bigger. We delivered strong growth in Q4. ***And despite typical seasonality where Q1 should be softer than Q4, we are guiding to meaningful sequential growth. That reflects both continued strength in gaming and the scaling of our e-commerce and our self-service customers.***

85. During the question-and-answer portion of the FY Earnings Call, an analyst asked a question about the Company's potential e-commerce opportunity through AppLovin Ads. In response, Defendant Foroughi continued to tout the prospects and growth of the Company's AI models, stating, in relevant part:

> So the e-commerce business obviously has been live with us for 1.5 years. It's doing really well. In Q4, we opened up the self-service platform, referral only. So we're not at the point yet where we're sort of a [general availability ("GA")] type launch. We'll get there. We said first half of this year, that's still on track. ***What gets us excited are a couple of things. One is the current customers that had lapped Q4 2024 into Q4 2025 saw material increases in***

> ***spend as our models just keep getting better.***
>
> Now remember, this business and the model around this business that drives the value for the advertisers is really in its infancy. It takes us a while to continuously iterate to improve the model. In fact, just a few weeks ago, we had a pretty sizable uplift. So those same customers from the prior year cohort saw big growth. Then you ended up with new customers coming in from the referral program***. I mentioned on the last earnings call, we were seeing substantial growth there.*** We're not going to see anything that's going to impact our overall numbers for a while, ***but we're seeing great trends***. And I'll talk about advertising, leading advertisers into our platform later on the call, but ***we're just seeing numbers that get us excited.***

86. During the FY 2025 Earnings Call, Defendant Foroughi also emphasized the advancements in the Company's AI model used in its e-commerce and gaming verticals, including its ability to learn through its own results. In particular, Defendant Foroughi stated the following, in pertinent part:

> ***[T]he gaming model based on its own results can improve. So it creates its own memories, it gets smarter. The e-commerce model is the same thing***, but I do just remind people that we're much earlier in e-commerce. We have very little data in the marketplace. So if you think about transactional volume that we have in gaming, we've got most of the market inside our system. So the model is pretty complete from a data perspective. . . .
>
> E-commerce is newer. It's starting from an earlier place. We have much less data penetration. ***So we can't go and track like***, okay, in a stable world, ***how much is the model improving because the model is going to be improving much more so from our team improving the model with changes and then just customers coming on***. Every new customer that pixels their site passes data to us, both engagement data and transactional data. So as we get customer ramp up, our data penetration in the market is going to go from very little to much greater. ***And as that happens, that's going to be a big catalyst for improvement in that category.***

87. Defendant Foroughi was also asked about the performance of the Company's e-commerce vertical. In response, he emphasized the role the Company's AI models had

in the recently improved performance of the e-commerce vertical, providing in relevant part:

> ***[T]he team is constantly improving the model. We do a lot of testing. We saw a material lift in the model. We rolled it out. Advertisers saw a huge improvement in return on ad spend. They started putting more budget into our system quickly. So those are the types of things that really catalyze growth for us. . . .***
>
> ***Our system is constantly improving because our team is improving these models.*** They do internal research, they use external research published in the AI field. These techniques can apply to what we do. And when they apply well, these advertisers see gains.

88. During the question-and-answer portion of the FY 2025 Earnings Call, an analyst asked about the improvements in the AI model used in the Company's e-commerce vertical and the estimated impact the launch of the AppLovin Ads for general availability would have on the Company's financials. In response, Defendant Foroughi continued to assure investors of consistent growth in its models, stating in relevant part:

> [T]aking a self-service platform and opening it up, I wouldn't imagine day 1 or month 1 or month 2 is really going to move the needle on the overall numbers. It's going to build over time. . . . I wouldn't expect it to be immediately impactful as a major growth catalyst. ***It will be noticeable in our numbers.*** When it comes to improving the models, we don't call it out anymore. ***We're constantly improving the gaming models. It happens every single quarter that we find something.***

89. Also during the FY 2025 Earnings Call, Defendant Foroughi highlighted the benefits to customers its generative AI video tool, including lower costs for video content and interactive page creation. In particular, he stated the following, in relevant part:

> [T]he customers have to get more accustomed to our platform to know what types of creatives work so that they can build up production around the things that work and multiply out the count. More importantly, though, ***generative AI tools to build creatives in a really low-cost way in an automated way is on the way.*** We already have in a pilot with over 100 customers, generative

> AI-based tools for one part of the ad unit. Our ads are a video plus then an interactive page and then follow-up of a shop preview dynamic product page. But that middle one, the interactive page is not something that these advertisers are accustomed to building because they don't need them on social or search.
>
> We're now generating those automatically for over 100 customers. ***We'll roll that out soon as it's showing good performance to the broader set of customers. And shortly, we're going to have the video model go live as well.*** We're going to run the same pilot process. We're going to make sure the video output looks good. But ***if we get to a place where the video model can help these customers create new video ads in bulk in cost of dollars versus cost of thousands of dollars, we expect the count of ads for these new customers on our platform is going to go up a lot***, and that will make them more competitive against the gaming customers that are on our platform.

***March 4, 2026 Investor Conference***

90. On March 4, 2026, Defendant Stumpf spoke on behalf of the Company at the Morgan Stanley Technology, Media & Telecom conference (the "Morgan Stanley 2026 Conference"). During the Morgan Stanley 2026 Conference, Defendant Stumpf asserted that the Company's AI models were seeing continous improvements, stating, in relevant part:

> [W]hen we initially mentioned to investors in the public markets around the 20% to 30% we just wanted to frame for investors that there's a lot of opportunity there for continued growth with the core technology on the mobile gaming side of the business. ***We broke it down for investors very simply that between directed model enhancements and recursive learning that's happening on an ongoing basis, we should be able to get at least that 20% to 30%***. . . . What investors need to understand is that this technology is very nascent. So ***our engineers are continuing to come up with directed model enhancements to make the technology better. And as we grow and scale, what that means for the technology is that we're getting more data to feed into it, which then improves the technology over time and continues to stack and compound*** and as we expand out on things like e-commerce, that will continue to grow the technology's ability to scale and drive spend at the return goals of our advertisers.

***April 21, 2026 Proxy Statement***

91. On April 21, 2026, Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb solicitated the 2026 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

92. The 2026 Proxy Statement asked shareholders to vote, *inter alia*, to: (1) elect Defendants Foroughi, Billings, Chen, Georgiadis, Messing, Morgenfeld, Vivas, Valenzuela, and Webb to the Board for a one-year term; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ending on December 31, 2026; (3) approve, on an advisory basis, the compensation of the Company's named executives; and (4) approve an amendment to the Company's Amended and Restated Certificate of Incorporation which would provide officer exculpation as permitted under Delaware law.

93. Regarding the "Role of our Board in the Risk Oversight Process," the 2026 Proxy Statement provides the following, in relevant part:

> **How Our Board Oversees Risk**
>
> As our business and operations evolve, we remain focused on identifying, assessing, and mitigating risks that could impact our current and future business as they emerge. While our management team handles the day-to-day oversight of strategic, financial, operational, reputational, and legal risks, our Board of Directors and its independent committees play a critical role providing high-level oversight of those risks and maintaining a risk management framework that fosters accountability and is responsive to the Company's evolving operations.
>
> **How Our Board Stays Engaged**
>
> Our Board of Directors and its committees actively engage on key risk areas through:
>
> - ongoing consultations with the management team on strategic and operational priorities;

- regular updates on key areas of enterprise risk and periodic evaluations of our structure for reporting enterprise risks to the Board and its committees;

- Q&A sessions or periodic reports from the management team and external advisors on key risk areas; and

- evaluating the risks inherent in major transactions and corporate decisions.

(Emphasis in original).

94. In the same section, the 2026 Proxy Statement elaborates on the Board and its committees oversight functions. Specifically, the 2026 Proxy Statement provides the following, in relevant part:

> To bolster our Board's risk oversight, our Board's committees oversee specific key risk areas and receive regular updates from management and industry experts, as needed.
>
> - **Audit Committee**: Oversees financial reporting, internal controls, disclosure controls and procedures, AI governance, cybersecurity, data privacy and protection matters, legal and regulatory compliance, and conflicts of interest. Regularly engages with management and auditors on risk assessment policies and risk management pertaining to financial, accounting, and tax matters.
>
> - **Compensation Committee**: Evaluates risks related to executive compensation, oversees our compensation structure to promote sound decision-making and prevent excessive risk-taking, administers our compensation recovery policy, and oversees our human capital resource management.
>
> - **Nominating and Corporate Governance Committee**: Focuses on risks tied to corporate governance, succession planning, and Board independence.
>
> ***

> **Leveraging Expertise for Risk Management**
>
> Our management team regularly consults with our Board outside of scheduled meetings. In particular, management frequently consults with the applicable committee chairperson whose committee oversees specific risk areas for guidance and feedback on relevant topics between scheduled meetings.
>
> To stay ahead of emerging challenges and proactively approach dynamic issues, our Board of Directors and its committees also engage outside legal and subject-matter experts, as well as accounting and tax professionals, to provide insights on market trends, regulatory shifts, and evolving risk landscapes. We hold multiple director education sessions with these outside experts throughout the year to review and discuss emerging topics.
>
> We see risk oversight as more than just a compliance requirement—it's an essential part of how we drive innovation, safeguard our Company, and create long-term value for all stakeholders.

(Emphasis in original).

95. Regarding the "Audit Committee,", the 2026 Proxy Statement provides the following, in relevant part:

> Our Audit Committee plays a crucial role in helping us to maintain our financial integrity, transparency, and strong internal controls. The Audit Committee provides independent oversight of our financial reporting, risk management, and compliance processes, helping to safeguard the trust of our stockholders, employees, and partners.
>
> Each member of our Audit Committee meets the independence standards for audit committee members required by the Nasdaq corporate governance rules and SEC rules and regulations. Additionally, all members meet the financial literacy and sophistication requirements of the Nasdaq corporate governance rules and our Board of Directors has determined that Messrs. Morgenfeld, Billings, and Webb and Ms. Georgiadis qualify as audit committee financial experts under Item 407(d) of Regulation S-K under the Securities Act of 1933, as amended (the "Securities Act").
>
> Key responsibilities of the Audit Committee include:
>
> **Financial Oversight & Reporting**

- reviewing our financial statements, earnings releases, and SEC filings;
- overseeing internal audit procedures to evaluate effectiveness and results;
- reviewing and discussing audit findings, financial statement accuracy, and internal control measures with management and our independent registered public accounting firm;

**Risk Management & Compliance**

- promoting strong internal controls and reviewing policies on financial risk, tax, and accounting matters;
- overseeing legal and regulatory compliance, including with respect to cybersecurity, artificial intelligence (AI), data privacy, and information security to protect Company and user data;
- reviewing related party transactions;
- overseeing and maintaining procedures for employees to report concerns anonymously about questionable accounting or audit matters;

(Emphasis in original).

96. Regarding "Corporate Governance Guidelines & Code of Conduct," the 2026 Proxy Statement provides the following:

> Our Corporate Governance Guidelines cover how we run our Board of Directors and Company governance matters, including the role of the Board, director qualifications, limitations on additional board service for employee and non-employee directors, Board and committee self-evaluations, and matters regarding our standing Board committees. We have also adopted a Code of Conduct and Business Ethics which applies to every employee, officer, and director and guides how we conduct business with integrity and accountability. You can find our full Corporate Governance Guidelines and Code of Conduct and Business Ethics on our website at https://investors.applovin.com. Any amendments or waivers for executive officers or directors will be posted there or disclosed in SEC filings as required.

97. Regarding the "Insider Trading Policy," the 2026 Proxy Statement provides the following:

> Our Board of Directors has adopted an Insider Trading Policy governing the purchase, sale, and/or disposition of our securities by directors, officers, employees, and other covered persons. We believe this policy is reasonably designed to promote compliance with insider trading laws, rules and regulations, and the exchange listing standards applicable to us. A copy of our Insider Trading Policy was filed as an exhibit to our Annual Report on Form 10-K for the fiscal year ended December 31, 2025. From time to time, we engage in transactions in our own securities. It is the Company's policy to comply with all applicable securities laws and the exchange listing standards applicable to us when engaging in transactions in our securities.
>
> Our Insider Trading Policy generally prohibits short sales, engaging in transactions in publicly-traded options (such as puts and calls), and other derivative securities relating to our common stock. This prohibition extends to any hedging or similar transaction designed to decrease the risks associated with holding our securities. In addition, members of our Board of Directors and our employees, including our named executive officers, are prohibited from pledging our securities or holding any of our securities in a margin account; however, upon pre-clearance from a compliance officer in accordance with the Insider Trading Policy, employees may pledge up to 10% of their outstanding common stock as collateral for a loan. Transactions involving a broad-based index or a broad-based fund that include Company securities in addition to securities of other companies, including, for example, transactions involving exchange funds pursuant to which an insider divests Company securities, are not considered hedging transactions under our policy. In addition, specific exceptions to the policy may be granted by a compliance officer in consultation with our Nominating and Corporate Governance Committee when the exception would not otherwise contravene the law or the purposes of the policy.

98. Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb caused the 2026 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) there were material development delays with the generative AI video tool intended for use in the Company's advertising platform; (2) as a result, the AI video tool would likely not meet its expected release

timeline; (3) the fast pace and consistency of AI model improvements was not sustainable; and (4) thus, the reliability and purported benefits, of the Company's AI models to both consumers and the Company were overstated.

99. The 2026 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

100. As a result of Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Foroughi, Billings, Chen, Georgiadis, Messing, Morgenfeld, Valenzuela, Vivas, and Webb to the Board ,thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ending on December 31, 2026; (3) approve, on an advisory basis, the compensation of the Company's named executives; and (4) approve an amendment to the Company's Amended and Restated Certificate of Incorporation which would provide officer exculpation as permitted under Delaware law.

***May 6, 2026 Earnings Call***

101. On May 6, 2026, the Company held the Q1 2026 Earnings Call. During the Q1 2026 Earnings Call, Defendant Foroughi touted the AI model's impact on AppLovin's financial performance and reiterated that the Company's AI models would continue to improve consistently. Specifically, Defendant Foroughi stated, in relevant part:

> [T]hat brings me to the consumer vertical, which is growing even faster than gaming. This is still only 1.5-years-old product. I want people to really internalize that. And it is scaling at a pace that gets us very excited. A couple

> of weeks ago, ***we had another material model release that improves scale and return on ad spend significantly for our consumer advertisers. These are the types of compounding improvements we have talked about on prior calls. The team improves the model, advertisers see better returns and they put more budget into our system. It is a virtuous cycle, and it is working.***

102. Moreover, Defendant Foroughi reiterated the value of the Company's generative AI video tool and stated it was going to be rolled out to customers "shortly," stating in relevant part:

> [T]he creative placement on our platform is much different than anywhere else in the world. Because it is so different and unique, advertisers have a problem coming to platform and investing in the creative resources necessary to make our platform scale. ***It was critical for us to get a model on top of the popular image and video generation models out so that we can hand to advertisers the capacity to just create ads out of the box that work for our platform.*** We rolled out something called our interactive page generator earlier in the quarter. That's out to all customers.
>
> ***But more important is the video side***. ***That's still in testing. We're going to roll it out to all accounts shortly***. And then that's important before we go to a general release as well because that was the point that I mentioned on the last earnings call, advertisers trip up on -- ***is a lot of advertisers don't even have video for a platform like us. We'll hand it to them with these tools***.

103. During the Q1 2026 Earnings Call, Defendant Foroughi assured investors that the rapid pace of improvements to AppLovin's AI models would continue. In particular, Defendant Foroughi responded to an analyst's question on this matter in the following exchange:

> *[Question:]* It feels like we're seeing a faster pace of directed model improvements of late. Is that – one, is that right?
>
> And two, if so, is there something that you guys have figured out about your underlying models that is leading to a faster pace of improvement or some unlock there? Could the next 1.3% come faster?

* * *

> *[Defendant Foroughi:]* This is really a testament to the team. ***We're now further evolved at understanding how to improve these models, right?*** So they understand the techniques. They've gotten more sophisticated at what they're doing.
>
> The AI research space, obviously, is seeing fast improvement, too. You've seen an insane amount of product releases in the large language model space in short order because of everything that's happening there. ***A lot of those same trends apply to us, but I think it starts with our team is just getting much smarter about the tests that they're doing.***
>
> ***So we have 100% seen faster improvements to the models, both across the consumer business and the gaming business. And we don't really see a reason why that's going to slow down.*** As our team of researchers get smarter about the things that they're testing, the success rate goes up, which is going to enable us to continue to push the technology forward, to drive better return on ad spend.

104. The statements above, referenced in ¶¶ 83-90 and ¶¶ 101-103, were materially false and/or misleading because Specifically, the Individual Defendants made and/or caused the Company to make false and/or misleading statements and failed to disclose that: (1) there were material development delays with the generative AI video tool intended for use in the Company's advertising platform; (2) as a result, the AI video tool would likely not meet its expected release timeline; (3) the fast pace and consistency of AI model improvements was not sustainable; (4) thus, the reliability and purported benefits, of the Company's AI models to both consumers and the Company were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## <u>The Truth Emerges</u>

***July 13, 2026 Analyst Report***

105. The truth began to emerge on July 13, 2026, when the BofA Analyst Report was published noting lower than expected e-commerce growth for the Company during the month of June. In particular, the BofA Analyst Report revealed that, "AppLovin's

eCommerce footprint expanded at a slower pace in June" and "[w]eekly data has not shown a clear uptick since AppLovin opened to all eComm advertisers on 6/22, suggesting a muted GA start." Moreover, Bank of America Securities lowered its annual revenue expectations for the company, "assuming a slower initial GA ramp and advertisers (vs. 20K prior) by the end of CY26."

106. On this news, the price per share of the Company's common stock fell $64.13, or approximately 12.7%, from a closing price of $506.98 on July 10, 2026, to a close at $442.85 per share on July 13, 2026.

***August 5, 2026 Form 10-Q, Press Release, and Earnings Call***

107. The truth fully emerged on August 5, 2026, when the Company published a press release and the Q2 2026 Form 10-Q. The press release and the Q2 2026 Form 10-Q reported, among other things, lower than anticipated revenue—revenue of approximately $1.92 billion compared to previous estimates of approximately $1.94 billion.

108. The same day, the Company held the Q2 2026 Earnings Call. During the Q2 2026 Earnings Call, Defendant Foroughi admitted that the Company's disappointing financial performance for the quarter was in part a result of the slow pace of improvements to AppLovin's AI model, stating in relevant part:

> Gaming is still the majority of our revenue, and the single biggest driver of its growth is model performance. When our models improve, advertisers can profitably deploy more spend at their target return on ad spend goals and budgets naturally step up. This quarter came down to timing. ***Our pace of meaningful model improvement was lighter than normal during the quarter*** and the next step-up in model performance landed just after quarter end.

109. During the question-and-answer portion of the Q2 2026 Earnings Call, an analyst asked, "exactly what the sort of model breakthroughs that you were looking for that didn't happen[?]" Defendant Foroughi responded with the following, in relevant part:

> If you go back the last 12 quarters, every quarter, we've had really good growth, except for Q2 in single digits. . . . [E]very quarter that we've had these

outsized growth rates, we've had improvements to our model.

So if you recall, our gaming growth model we had given you all back in the day included one sizable improvement per year, but constant improvement to the models as well as on an ongoing basis. ***In this case, in Q2, we didn't have the same amount of uplift that we normally have in any other prior quarter. That came right after the quarter.*** So that's why Q3 has started really well, and that's why we've guided strong going forward.

110. During the Q2 2026 Earnings Call, an analyst asked Defendant Foroughi for additional clarification as to "why you didn't get the model uplift that you have expected in the quarter[.]" In response, Defendant Foroughi stated in relevant part:

It's R&D, right? ***Like there's no guarantee that we're always going to have lifts in every single period of 3 months.*** The team is always working on lifts. And usually, in every single quarter, it's not one lift that we get. We compound multiple small lifts. The impact was just smaller in Q2, followed by a pretty material uplift in Q3 in the early part of Q3.

And so that's just the reality of when you're building models. ***You're building models, you don't have a certainty on the impact of what you're testing, you're testing hypotheses, hoping for a good result.*** And so the system is a whole bunch of A/B tests looking for lifts. ***And there are going to be periods where we don't get material lifts.***

111. Moreover, an analyst asked about what potential improvements could be made to the AppLovin Ads. In response, Defendant Foroughi disclosed that the generative AI video tool had not yet launched, stating in relevant part:

The creative is the biggest hurdle in our system. So nothing has really changed there. Lengthy video plus interactive end card, which isn't a common ad unit, we can auto-generate the interactive end card with pretty high efficiency at this point. ***We're not at the point where we can yet get a high-quality video for 30 to 60 seconds in the hand of an advertiser out of the box. So that's still [a] work in progress.*** And we have examples where it works, other examples where it doesn't work.

The reality is, once we can get that to happen or we create alternative forms of templates that don't require a video, we'll be able to hand the advertisers a

> one-click campaign creation and that should resolve any sort of conversion rate issues on the flow.
>
> * * *
>
> And so, if you think about that like mid-market and up, probably has templates that match the creative needs on our platform. When you get into the SMBs that are signing up directly, they probably don't. And so we've got to resolve that as we go into wanting to get in more into long tail over time.

112. On this news, the price per share of the Company's stock fell $82.13, or approximately 19.7%, from a closing price of $417.80 on August 5, 2026, to a close at $335.67 per share on August 6, 2026.

**REPURCHASES DURING THE RELEVANT PERIOD**

113. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $1.2 billion to repurchase over 2.7 million shares of its own common stock at artificially inflated prices from February 2026 through June 2026.

114. According to the Form 10-Q filed with the SEC on May 6, 2026 (the "1Q 2026 Form 10-Q"), between February 1, 2026 and February 28, 2026, the Company repurchased 708,000 shares of its own common stock at an average price of $405.70, for a total cost to the Company of approximately $287,235,600.[2]

115. As the Company's common stock was actually only worth $335.67 per share, the price at closing on August 6, 2026, the Company overpaid by approximately $49,581,240 for repurchases of its own stock between February 1, 2026, and February 28, 2026.

116. According to the Q1 2026 From 10-Q, between March 1, 2026 and March 31, 2026, the Company repurchased 906,000 shares of its own common stock at an average

[2] Upon information and belief, these repurchases were made during the Relevant Period.

price of approximately $447.16, for a total cost to the Company of approximately $405,126,960.

117. As the Company's common stock was actually only worth $335.67 per share, the price at closing on August 6, 2026, the Company overpaid by approximately $101,009,940 for repurchases of its own stock between March 1, 2026, and March 31, 2026.

118. According to the Q2 2026 Form 10-Q, between April 1, 2026 and April 30, 2026, the Company repurchased 356,000 shares of its own common stock at an average price of $425.69 per share, for a total cost to the Company of approximately $151,545,640.

119. As the Company's common stock was actually only worth $335.67 per share, the price at closing on August 6, 2026, the Company overpaid by approximately $32,047,120 for repurchases of its own stock between April 1, 2026, and April 30, 2026.

120. According to the Q2 2026 Form 10-Q, between May 1, 2026, and May 31, 2026, the Company repurchased 260,000 shares of its own common stock at an average price of $481.10 per share, for a total cost to the Company of approximately $125,086,000.

121. As the Company's common stock was actually only worth $335.67 per share, the price at closing on August 6, 2026, the Company overpaid by approximately $37,811,800 for repurchases of its own stock between May 1, 2026, and May 31, 2026.

122. According to the Q2 2026 Form 10-Q, between June 1, 2026, and June 30, 2026, the Company repurchased 489,000 shares of its own common stock at an average price of $511.61 per share, for a total cost to the Company of approximately $250,177,290.

123. As the Company's common stock was actually only worth $335.67 per share, the price at closing on August 6, 2026, the Company overpaid by approximately $86,034,660 for repurchases of its own stock between June 1, 2026, and June 30, 2026.

124. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its common stock by approximately $306.5 million.

## DAMAGES TO APPLOVIN

125. As a direct and proximate result of the Individual Defendants' conduct, AppLovin has lost and will continue to lose and expend many millions of dollars.

126. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

130. As a direct and proximate result of the Individual Defendants' conduct, AppLovin has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

131. Plaintiff brings this action derivatively and for the benefit of AppLovin to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of AppLovin, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act.

132. AppLovin is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133. Plaintiff is, and has been at all relevant times, a shareholder of AppLovin. Plaintiff will adequately and fairly represent the interests of AppLovin in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

135. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, AppLovin's Board consisted of the following nine individuals: Defendants Foroughi, Billings, Chen, Georgiadis, Messing, Morgenfeld, Valenzuela, Vivas, and Webb (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time this action was filed.

136. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly engage to in and/or cause the Company to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

137. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted AppLovin to issue materially false and misleading statements. Specifically, the Director-Defendants caused AppLovin to issue false and misleading statements which were intended to make AppLovin appear more

profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

138. Additional reasons that demand on Defendant Foroughi is futile follow. Defendant Foroughi co-founded the Company in 2011 and has since served as its CEO and as a director. He previously served as Chairperson of the Company's Board from March 2021 to April 2026. In addition, Defendant Foroughi is the controlling shareholder of the Company. The Company provides Defendant Foroughi with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Defendant Foroughi also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of the Director-Defendants and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein, and personally made many of the false and misleading statements himself. Moreover, Defendant Foroughi's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. Moreover, Defendant Foroughi is named as a defendant in the Securities Class Action. For these reasons, Defendant Foroughi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139. Additional reasons that demand on Defendant Billings is futile follow.

Defendant Billings has served as a Company director since December 2020, and as the Chairperson of the Board since April 2026. Defendant Billings previously served as the Lead Independent Director from February 2021 until he began his tenure as Chairperson of the Board. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Billings has received and continues to receive handsome compensation for his role as a director. Defendant Billings also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of Director-Defendants and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Billings breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

140. Additional reasons that demand on Defendant Chen is futile follow. Defendant Chen has served as a Company director since August 2018. Previously, Defendant Chen also served as President and CFO of the Company from November 2019 until December 2023. Thus, as the Company admits, Defendant Chen is a non-independent director. Defendant Chen also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of Director-Defendants and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Chen breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

141. Additional reasons that demand on Defendant Georgiadis is futile follow. Defendant Georgiadis has served as a Company director since January 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Georgiadis has received and continues to receive handsome compensation for her role as a director. Defendant Georgiadis also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of the Director-Defendants and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Georgiadis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

142. Additional reasons that demand on Defendant Messing is futile follow. Defendant Messing has served as a Company director since March 2024. She also serves as a member of Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Messing has received and continues to receive handsome compensation for her role as a director. Defendant Messing also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of the Director-Defendants and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect

corporate assets. For these reasons too, Defendant Messing breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

143. Additional reasons that demand on Defendant Morgenfeld is futile follow. Defendant Morgenfeld has served as a Company director since September 2023. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Morgenfeld has received and continues to receive handsome compensation for his role as a director. Defendant Morgenfeld also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of the Director-Defendants and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Morgenfeld breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

144. Additional reasons that demand on Defendant Valenzuela is futile follow. Defendant Valenzuela has served as a Company director since June 2026. She previously served as the Company's Chief Administrative and Legal Officer and Corporate Secretary from July 2025 to August 2026. Defendant Valenzuela also served as the Company's Chief Legal Officer and Corporate Secretary from May 2020 to July 2025. Thus, as the Company admits, she is a non-independent director. Defendant Valenzuela has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously

disregarded her duties to protect corporate assets. Moreover, Defendant Valenzuela's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate her motive to participate in the scheme. For these reasons too, Defendant Valenzuela breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

145. Additional reasons that demand on Defendant Vivas is futile follow. Defendant Vivas has served as a Company director since August 2018. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Vivas has received and continues to receive handsome compensation for his role as a director. Defendant Vivas also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of the Director-Defendants and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Vivas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

146. Additional reasons demand on Defendant Webb is futile follow. Defendant Webb has served as a Company director since April 2025. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Webb has received and continues to receive handsome compensation for his role as a director. Defendant Webb also solicited the 2026 Proxy Statement, which contained false and misleading statements and resulted in the election of the Director-Defendants and himself to the Board, thereby allowing them to continue breaching their

fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Webb's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons, Defendant Webb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

147. Additional reasons that demand on the Board is futile follow.

148. Defendants Morgenfeld (as Chair), Billings, Georgiadis, and Webb (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to disseminate materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

149. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of

fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

150. AppLovin has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for AppLovin any part of the damages AppLovin suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

151. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

152. The acts complained of herein constitute violations of fiduciary duties owed by AppLovin's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

153. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors'

and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AppLovin. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of AppLovin, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

154. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause AppLovin to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

155. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb for Violations of Section 14(a) of the Exchange Act**

Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

157. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

158. Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb caused the 2026 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) there were material development delays with the generative AI video tool intended for use in the Company's advertising platform; (2) as a result, the AI video tool would likely not meet its expected release timeline; (3) the fast pace and consistency of AI model improvements was not sustainable; (4) thus, the reliability and purported benefits, of the Company's AI models to both consumers and the Company were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

159. Under the direction and watch of Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb, the 2026 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and

were causing or permitting the Company to issue false and misleading statements.

160. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2026 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2026 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

161. As a result of Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Foroughi, Billings, Chen, Georgiadis, Messing, Morgenfeld, Valenzuela, Vivas, and Webb to the Board for a term of one year, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ending on December 31, 2026; (3) approve, on an advisory basis, the compensation of the Company's named executives; and (4) approve an amendment to the Company's Amended and Restated Certificate of Incorporation which would provide officer exculpation as permitted under Delaware law.

162. The Company was damaged as a result of Defendants Foroughi, Billings, Chen, Dawson, Georgiadis, Messing, Morgenfeld, Vivas, and Webb material misrepresentations and omissions in the 2026 Proxy Statement.

163. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

164. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

165. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding AppLovin. Not only is AppLovin now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon AppLovin by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 2.7 million of its own shares at artificially inflated prices, damaging AppLovin.

166. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

167. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AppLovin not misleading.

168. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material fats set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though they were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

169. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

170. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171. The Individual Defendants, by virtue of their positions with AppLovin and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AppLovin and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause AppLovin to engage in the illegal conduct and practices complained of herein.

172. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

173. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AppLovin's business and affairs.

175. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

176. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AppLovin.

177. In breach of their fiduciary duties owed to AppLovin, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) there were material development delays with the generative AI video tool intended for use in the Company's advertising platform; (2) as a result, the AI video tool would likely not meet its expected release timeline; (3) the fast pace and consistency of AI model improvements was not sustainable; (4) thus, the reliability and purported benefits, of the Company's AI models to both consumers and the Company were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

178. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

179. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

180. In yet further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $110 million.

181. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the

purpose and effect of artificially inflating the price of AppLovin's securities.

182. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AppLovin's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

183. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AppLovin has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## FIFTH CLAIM
## Against the Individual Defendants for Unjust Enrichment

186. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AppLovin.

188. The Individual Defendants either benefitted financially from the improper

conduct, or received bonuses, stock options, or similar compensation from AppLovin that was tied to the performance or artificially inflated valuation of AppLovin or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

189. Plaintiff, as a shareholder and a representative of AppLovin, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

190. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

191. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AppLovin, for which they are legally responsible.

193. As a direct and proximate result of the Individual Defendants' abuse of control, AppLovin has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

194. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

195. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

duties with regard to prudently managing the assets and business of AppLovin in a manner consistent with the operations of a publicly held corporation.

197. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AppLovin has sustained and will continue to sustain significant damages.

198. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

199. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

**EIGHTH CLAIM**

**Against the Individual Defendants for Waste of Corporate Assets**

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

202. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AppLovin to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

203. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

204. Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

**NINTH CLAIM**

**Against Defendants Foroughi and Stumpf for Contribution Under Sections 10(b) and 21D of the Exchange Act**

205. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206. AppLovin and Defendants Foroughi and Stumpf are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Foroughi's and Defendant Stumpf's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

207. Defendants Foroughi and Stumpf, because of their positions of control and authority as controlling shareholder, officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

208. Accordingly, Defendants Foroughi and Stumpf are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

209. As such, AppLovin is entitled to receive all appropriate contribution or indemnification from Defendants Foroughi and Stumpf.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of AppLovin, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AppLovin;

(c) Determining and awarding to AppLovin the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing AppLovin and the Individual Defendants to take all necessary actions to reform and improve AppLovin's corporate governance and internal procedures to comply with applicable laws and to protect AppLovin and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of AppLovin to nominate at least five candidates for election to the Board;
3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding AppLovin restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

//

//

//

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

# VERIFICATION

I, Amit Patel, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th__ day of October 2026.

DocuSigned by:
Amit Patel
44960272F5D641F...

Amit Patel